**Fill in this information to identify the case:**

Debtor name  **Providence Hospital of North Houston LLC**

United States Bankruptcy Court for the:  SOUTHERN DISTRICT OF TEXAS

Case number (if known)  **20-34238**

☐ Check if this is an amended filing

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property          12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:**     **Cash and cash equivalents**

**1. Does the debtor have any cash or cash equivalents?**

☐ No.  Go to Part 2.
☑ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

3.      **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1.  **Independent Financial formerly Independent Bank** | Checking | 8405 | $18,120.18 |

4.      **Other cash equivalents** *(Identify all)*

5.      **Total of Part 1.**
Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.           **$18,120.18**

**Part 2:**     **Deposits and Prepayments**

**6. Does the debtor have any deposits or prepayments?**

☑ No.  Go to Part 3.
☐ Yes Fill in the information below.

**Part 3:**     **Accounts receivable**

**10. Does the debtor have any accounts receivable?**

☐ No.  Go to Part 4.
☑ Yes Fill in the information below.        **SEE ATTACHED EXHIBIT A/B #11b**

11.      **Accounts receivable**

| 11b. Over 90 days old: | **1,053,538.00** | - | **0.00** | =.... | **$1,053,538.00** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

| Debtor | **Providence Hospital of North Houston LLC** | Case number *(If known)* | **20-34238** |
|---|---|---|---|
| | Name | | |

| 12. | **Total of Part 3.** | $1,053,538.00 |
|---|---|---|
| | Current value on lines 11a + 11b = line 12.  Copy the total to line 82. | |

**Part 4:**     **Investments**

13. **Does the debtor own any investments?**

■ No.  Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:**     **Inventory, excluding agriculture assets**

18. **Does the debtor own any inventory (excluding agriculture assets)?**

■ No.  Go to Part 6.
☐ Yes Fill in the information below.

**Part 6:**     **Farming and fishing-related assets (other than titled motor vehicles and land)**

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No.  Go to Part 7.
☐ Yes Fill in the information below.

**Part 7:**     **Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No.  Go to Part 8.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39.   **Office furniture** | | | |
| 40.   **Office fixtures** | | | |
| 41.   **Office equipment, including all computer equipment and communication systems equipment and software** **SEE ATTACHED EXHIBIT A/B #41 (SUBJECT TO UMMC MOU AND BILL OF SALE)** | | | |
| 42.   **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |

| 43. | **Total of Part 7.** | |
|---|---|---|
| | Add lines 39 through 42.  Copy the total to line 86. | |

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
☐ No
■ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
■ No
☐ Yes

**Part 8:**     **Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

**EXHIBIT A/B #11b**

AR

**Providence Hospital of North Houston, LLC**
**Accounts Receivable**

**11b.**                    **Over 90 days old**

| What | Face Amount | Doubtful or Uncollectible Accounts | Net Value | Comment |
|---|---|---|---|---|
| Patient Accounts Receivable | 10,116,208 | Unknown | Unknown | |
| Receivable from UMMC | 1,053,538 | 0 | 1,053,538 | See tab UMMC for details |
| Other receivables: | | | | |
| SE Texas ER & Hospital (Formerly ICON) | 865,841 | 865,841 | 0 | PHNH provided lab and management services and lab supplies |
| Progressive Women's Health | 5,500 | 5,500 | 0 | Inv was for a box of 5 - Genesis HTA kit Part number M0068580210 |
| Townsen Memorial Hospital | 4,068 | 4,068 | 0 | Lap tray set |
| | | | | Biopsy procedure supplies; there is a liability for $154.39 as they paid another invoice twice.  If invoice owed is offset with the duplicate payment made by Liberty Dayton, then |
| Liberty Dayton Regional | 46 | 46 | 0 | PHNH would owe Liberty Dayton. |

# EXHIBIT A/B #11b

## UMMC

**UMMC Receivable Detail**

| Date | Amount | Description |
|------|--------|-------------|
| 09/01/19 | 500,000.00 | Last payment from sale of business |
| 09/20/19 | 82,467.27 | Loan payment on Independent Bank Loan ending in 0541 |
| 09/23/19 | 44,455.03 | Loan payment on Independent Bank Loan ending in 4023 |
| 10/20/19 | 82,467.27 | Loan payment on Independent Bank Loan ending in 0541 |
| 10/23/19 | 44,455.03 | Loan payment on Independent Bank Loan ending in 4023 |
| 11/20/19 | 82,467.27 | Loan payment on Independent Bank Loan ending in 0541 |
| 11/26/19 | 44,455.03 | Loan payment on Independent Bank Loan ending in 4023 |
| 12/20/19 | 82,467.27 | Loan payment on Independent Bank Loan ending in 0541 |
| 12/23/19 | 44,455.03 | Loan payment on Independent Bank Loan ending in 4023 |
| 01/31/20 | 31,020.19 | UMMC portion of the BPP taxes paid in Jan 2020 for 2019 |
| 09/01/19 | 32.95 | Omni Fire & Security – Service for 9/2019 |
| 09/01/19 | 1,649.13 | Waste Management bill for service period 9/2019 |
| 09/01/19 | 2,871.65 | Canon Lease payment for RadPro DR System Merry X-Ray for 9/2019 |
| 09/01/19 | 620.61 | OWDT payment for website hosting and maintenance – 9/2019 |
| 09/24/19 | 1,658.12 | Waste Management bill for service period 10/2019 |
| 09/30/19 | 1,200.00 | Biomedical Waste Solutions bill for 9/2019 |
| 10/01/19 | 211.60 | Shred-It payment for service dates 9/11/19 |
| 10/01/19 | 32.95 | Omni Fire & Security – Service for 10/2019 |
| 10/03/19 | 2,213.43 | Microsoft Office 365 E1 - Online Services - Billing Period: 09/03/2019 - 10/02/ |
| 10/06/19 | 620.61 | OWDT payment for website hosting and maintenance – 10/2019 |
| 10/22/19 | 316.92 | Shred-It payment for service dates 9/25/2019 and 10/9/2019 |
| 11/06/19 | 620.61 | OWDT payment for website hosting and maintenance – 11/2019 |
| 11/22/19 | 316.92 | Shred-It payment for service dates 10/23/19, 11/6/19  and 11/20/19 |
| 12/01/19 | 883.95 | ADP Benefit adjustment for December 2019 |
| 11/06/19 | 620.61 | OWDT payment for website hosting and maintenance – 12/2019 |
| 12/22/19 | 221.52 | Shred-It payment for service dates 12/4/19 and 12/17/19 |
| 01/22/19 | 231.44 | Shred-It payment for service dates 12/31/19 and 1/15/2020 |
| 02/01/20 | 505.61 | ADP Benefit adjustment for Nov 2019 |

Total      1,053,538.02

# EXHIBIT A/B #41

**Providence Hospital of North Houston**
**Schedule A/B #41**

**Office equipment, including all computer equipment and communication systems equipment and software (subject to UMMC MOU and Bill of Sale)**

| Description | Net book value of debtor's interest | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **Computer Equipment** | | | |
| | | | |
| **Hardware:** POE Switches for Phones | | | |
| - CIsco SG-300-52 port switch (9) | | | |
| - Cisco SG300 28 port POE + Switch (1) | | | |
| - Cisco MVBSX1 Mini-Gbic (10) | | | |
| - Cisco Catalyst 4500-48 port POE modules (6) | | | |
| - Cisco Catalyst 4500 Supervisor (1) | 11,046 | E-Bay | 4,887 |
| Purchase to Texas Systems Group | 15,312 | Net book value | 15,312 |
| Optiplex 5000 Series - 20 5040 SFF, 5 - 5040 MT | 7,692 | E-Bay | 6,000 |
| Netgear Ready NAS, Seagate Iron Wolf, Cat 6 Network | 1,572 | Net book | 1,572 |
| Rack, OCUCOBOL | 7,132 | Net book | 7,132 |
| **Software** | | | |
| Digiu Server Software | - | Net book value; software purchased in 2016 | - |
| Amkai Office/Charts Software for Hospital | - | Net book value; software purchased in 2016 | - |
| Network infrastructure, power & enviromental, software & warranty | - | Net book value; software purchased in 2016 | - |
| MD Staff (Web) Cloud including E Priv & MD Query, with MD App and virtual Committee - creditialing software | - | Net book value; software purchased in 2016 | - |
| Oppor Sr Network Architect; Engineering Services | - | Engineering services | - |
| Cloud infrastructure - Encrypted Cloud Infrastructure platform purposed for application.services execution, data storage and onsite/offsite data protection - 8 TB (April 2016 and 8 TB May 2016) | - | E-Bay | 310 |
| Oppr Infrastructre - IT Build Agreement - 50% of labor costs utilized up through May 1, 2016 | - | Engineering services | - |
| Polycom VVX 201 Business Media Phone w/o Power Supply (2); Polycom VVX-310 6-Line Desktop Phones, Gigabit Ethernet w/HD Voice w/o power supply (80); Digium Switchvox Gold Subscriptions (285 - 1 year license); Implementation Training and Labor | - | Ebay | 1,630 |
| Wellsoft - 75% of implementation and license fees billable upon contract acceptance - Emergency Department Information System | - | Net book value; software purchased in 2016 | - |
| Wellsoft - contract signed 5/27/2016, 25% of implementation and license fees | - | Net book value; software purchased in 2016 | - |
| Custom programming for a GoRev and Amkai Interface | - | Net book value; billing system GoRev no longer utilized | - |
| Hospital Infrastructure IT build Agreement - labor invoice | - | Net book value; labor to get infrasturcture up in 2016 | - |
| Dragon Dictation software | - | Ebay | 30 |

# EXHIBIT A/B #41

**Providence Hospital of North Houston**
**Schedule A/B #41**

**Office equipment, including all computer equipment and communication systems equipment and software (subject to UMMC MOU and Bill of Sale)**

| Description | | Value | Notes | |
|---|---|---|---|---|
| Wellsoft - As per terms of a proposal date July 18, 2016, 25% of Software license fee is billable upon completion | | - | Net book value; software purchased in 2016 | - |
| Visualutions - Interfaces - custom coded interfaces to softwares used by business | | - | Net book value; software purchased in 2016 | - |
| Powerscribe360/ Project Management | | - | Net book value; software purchased in 2016 | - |
| OWDT,LLC - Initial payment for web design and development | | - | PHNH website is no longer operational. | - |
| OWDT,LLC - final paymetn for web design and development | | - | PHNH website is no longer operational. | - |
| Nuance Communications, Inc. Powerscribe 360, Interface Download | | - | Net book value; software purchased in 2017 | - |
| VasoHealthcareIT - TOMO software - software for mammo upgrade. | | - | Net book value; software purchased in 2017 | - |
| VasoHealthcareIT - TOMO software - software for mammo upgrade. | | - | Net book value; software purchased in 2017 | - |
| Wellsoft's Emergency Department Software, Facility Charge capture Revision | | - | Net book value; software purchased in 2017 | - |
| CompuGroup Medical US - PHNH LabDaq Interface and Professional Services | $ | 6,069.00 | Net book value; software purchased in 2017 | |

Debtor **Providence Hospital of North Houston LLC**    Case number *(If known)* **20-34238**
Name

☐ No.  Go to Part 9.
■ Yes Fill in the information below.

| General description Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 48. **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 49. **Aircraft and accessories** | | | |
| 50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment) SEE ATTACHED EXHIBIT A/B #50 (SUBJECT TO UMMC MOU AND BILL OF SALE)** | | | |

51. **Total of Part 8.**

Add lines 47 through 50.  Copy the total to line 87.

52. **Is a depreciation schedule available for any of the property listed in Part 8?**
■ No
☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
■ No
☐ Yes

**Part 9:    Real property**

54. **Does the debtor own or lease any real property?**

■ No.  Go to Part 10.
☐ Yes Fill in the information below.

**Part 10:    Intangibles and intellectual property**

59. **Does the debtor have any interests in intangibles or intellectual property?**

■ No.  Go to Part 11.
☐ Yes Fill in the information below.

**Part 11:    All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No.  Go to Part 12.
■ Yes Fill in the information below.

**Current value of debtor's interest**

71. **Notes receivable**
Description (include name of obligor)

72. **Tax refunds and unused net operating losses (NOLs)**

# EXHIBIT A/B #50

**Providence Hospital of North Houston, LLC**
**Schedule of other machinery, fixtures and equipment**

| Description | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|
| **Equipment leases under Canon Financial** | | |
| RadPro DR System Merry X-Ray | Lease was assumed by UMMC | - |
| GE Precision 500D R/F Room (Block Imaging) | Lease was assumed by UMMC | - |
| Toshiba Infinix C-Arm | Lease was assumed by UMMC | - |
| Eaton-93PM/150kWUPS System N1 Critical Technologies | Lease was assumed by UMMC | - |
| TMS Therapy System | Lease was assumed by UMMC | - |
| Mark7-Arterion Bayer Injector | Lease was assumed by UMMC | - |
| Securview-RM-SVDX Hologic | Lease was assumed by UMMC | - |
| Canon CT Options | Lease was assumed by UMMC | - |
| Craneware Software | Lease was assumed by UMMC | - |
| GE HemoHemodynamic Combo Lab696-R3 and INW Server Up | Lease was assumed by UMMC | - |
| Omnicell Drug Dispenser | Lease was assumed by UMMC | - |
| Webster Vivid IQ Biosense | Lease was assumed by UMMC | - |
| Carto 3 System Biosense Webster | Lease was assumed by UMMC | - |
| UMS X-Ray System | Lease was assumed by UMMC | - |
| CIOS C Arm System | Lease was assumed by UMMC | - |
| CIOS C Arm System | Lease was assumed by UMMC | - |
| Siemens PET CT and Canon Vitrea | Lease was assumed by UMMC | - |
| MULTGEN2-VENOM100MM -Stryker RF Ablation Machine | Lease was assumed by UMMC | - |
| Canon Aplio 500 Ultrasound | Lease was assumed by UMMC | - |

Debtor   **Providence Hospital of North Houston LLC**          Case number *(If known)*   **20-34238**
_____
Name

Description (for example, federal, state, local)

73.   **Interests in insurance policies or annuities**

   **Gallagher Cyber Plus Policy #OC0525AAD619**                                      Unknown

---

74.   **Causes of action against third parties (whether or not a lawsuit has been filed)**
   **Claim for economic damages as a result of cyber attack in December 2019; loss covered by Gallagher Cyber Plus Policy**
   **SEE ATTACHED EXHIBIT A/B #74**                                      Unknown
   **Nature of claim**
   **Amount requested**                                    **$0.00**

---

75.   **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

76.   **Trusts, equitable or future interests in property**

77.   **Other property of any kind not already listed** *Examples:* Season tickets, country club membership
   **Option Agreeent pursuant to Asset Purchase Agreement between UMMC and 1960 Family Practice, P.A. dated 8/16/19 -- SEE ATTACHED EXHIBIT A/B #77**                                      Unknown

---

78.   **Total of Part 11.**
   Add lines 71 through 77. Copy the total to line 90.                          **$0.00**

79.   **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
   ■ No
   ☐ Yes

## EXHIBIT A/B #74

## Cyber Attack Summary

On December 11, 2019, the PHNH IT system was hit by a ransomware attack.  The IT system was located at the PHNH campus in the server room.  The virus traveled through the entire IT system including the 1960 Family Practice clinics, business office, ER and multiple other entities since the virus went into the GE (PAC system).  Additionally, the tmmsonline.net email system was also compromised and all emails have not been recovered.  VasoHealthcare IT was supposed to have maintained our entire network (pharmacies/business office/billing office/clinics/radiology/satellite locations).  Everything related to business was completely shut down.

Our cyber insurance policies allowed our insurance company to step in and the carrier paid the ransomware ($800K plus) and also paid a recovery IT company (outside firm) to recover the damaged IT system. After the insurance investigation was complete, it was determined that one of the computers located at the nurse station (Kim Harrington, CNO of UMMC North) opened an unintended email and the virus spread to all the network systems located at Providence Hospital.  UMMC was using our network system through a managed access and service agreement.

After several months, it was determined that only about 50% of the damaged software is recoverable. PHNH has not been able to send out claims and billing has been shut down 100%.

Economic damages have not been determined.  The equipment, various IT equipment, and software is the collateral of Independent Bank.

We have provided to the carrier the monies that PHNH has paid as well as vendor invoices that the carrier should pay.  PHNH does not have a functioning billing system.

See below a timeline on major events as they occurred as part of the remediation efforts to this ransomware attack.  All major systems impacted including, but not limited to, GE Centricity, GE PACS, MedQ, Allscripts, Amkai, CPSI, Mail Server, entire network.

- **12/11/2019:** Ransomware attack happened at 2.00 AM early morning. IT received multiple calls about systems not functioning. Basic troubleshooting was done but the systems remained down. Morning 9.00 AM – IT determined that the systems were hacked.
- **12/12/2019:** Dr. Le contacted carrier. PHNH began working with counsel for insurance carrier and Tracepoint (Insurance IT). Tracepoint came onsite to evaluate the network.
- **12/12/2019:** FBI Cyber Crime Dept. was notified about the incident. FBI came on site to investigate on the attack.
- **3 Weeks post attack:** Tracepoint completed its investigation and sent findings to their headquarters in Washington DC.
- **01/21/2020:** Management contacted Visualtions to evaluate Centricity Application.
- **01/28/2020 – 01/29/2020:** Visualtions came onsite, declared the centricity Database and application files were corrupted beyond repair and need a re-implementation.
- **02/13/2020:** Investigation findings meeting with Tracepoint, Insurance and insurance attorneys. All the findings were mentioned on the call.

## EXHIBIT A/B #74

- **02/27/2020:** Ontrack was contacted to Decrypt the data from the centricity Database. Ontrack sent a quote.
- **04/15/2020:** Carrier released payment to Ontrack for Centricity Data decryption.
- **04/20/2020:** Management contacted MedQ for troubleshooting the corrupt RIS system
- **04/20/2020:** Management contacted GE for troubleshooting the corrupt PACS system
- **04/28/2020:** Contacted Visualutions for Quotes on rebuilding Centricity application
- **05/01/2020:** Received Quote from MedQ. MedQ tried to troubleshoot the system for more than a week after they were contacted to determine if the existing system could be repaired. The system was not responsive and beyond repair. Decision was made to re-implement a new system.
- **05/05/2020:** Received the Decrypted data of Centricity Database from Ontrack
- **05/27/2020:** Received the Quote from GE. GE worked with the IT team for more than a month in troubleshooting the system, understanding the previous workflow and evaluating the current functionality. The system is beyond repair and GE sent a quote to fix the dead system. A part of GE (GE Archive) was acceptable and was not included in the quote.
- **During this Entire process IT has been working to rebuild all the systems that were affected with no patient data loss including all the computers (180) and servers (Active Directory, multiple File Servers, DNS&DHCP Servers, multiple Internal App Servers) and other networking equipment including Firewalls and switches .**

LE003463

**EXHIBIT A/B #77**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*") is made and entered into as of September 1st, 2019, by and among Doctors Hospital 1997 LP d/b/a United Memorial Medical Center, a Texas limited partnership ("*Purchaser*") 1960 Family Practice, PA, a Texas professional association ("*Seller*").

WHEREAS, Seller owns and operates a professional medical practice which provides professional medical and related services (the "*Practice*") at 837 Cypress Creek Parkway Suite 105, Houston Texas 77090; 20320 Northwest Freeway, Houston Texas 77065; 3550 Rayford, Spring, Texas 77386 and 5039 FM 2920, Spring Texas 77388 (the "*Practice Locations*");

WHEREAS, Purchaser desires to purchase from Seller the assets of Seller utilized in the Practice, and Seller wishes to sell such assets to Purchaser (the "*Transaction*").

NOW, THEREFORE, for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of all of which are forever acknowledged and confessed, the parties agree as follows:

## ARTICLE 1.    DEFINITIONS

**1.1 Definitions**. In addition to the other definitions contained in this Agreement, the following terms will, when used in this Agreement, have the following respective meanings:

"*Affiliates*" means, with respect to any Person, any Persons directly or indirectly controlling, controlled by, or under common control with, such other Person at any time during the period for which the determination of affiliation is being made. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"*Closing*" means the consummation of the transactions contemplated by and described in Article 2.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Confidential Information*" means information, to the extent not considered a Trade Secret under applicable law, that: (a) relates to the business of the Practice, (b) possesses an element of value to the Practice, (c) is not generally known to the Practice's competitors, and (d) would damage the Practice if disclosed. Confidential Information shall also include information of any third party provided to the New Practice which the New

LE003463

LE003464

**EXHIBIT A/B #77**

Practice is obligated to treat as confidential, including, but not limited to, information provided to the New Practice by its referral sources or patients. Confidential Information includes, but is not limited to, (e) future business plans, (f) financial statements, (g) information pertaining to agreements with third-party payers, (h) contracts with any payer or payee of medical services, preferred provider organizations, health maintenance organizations, or any other managed care entities or arrangements, (i) information regarding independent contractors, referral sources, and patients of the Practice, including, but not limited to, patient names, patient charts, lists or records, test results and reports, nurses' notes, operative notes, diagnoses or treatment plans, case histories, x-rays, and patients' financial information, and (j) information concerning the Practice's or a third party's financial structure and methods and procedures of operation. Confidential Information shall not include any information that: (k) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (l) has been independently developed and disclosed by others without violating this Agreement or the legal rights of any party, or (m) otherwise enters the public domain through lawful means.

"*Encumbrances*" means liens (including deed of trust liens, mechanic's or materialmen's liens and judgment liens), charges, encumbrances, security interests, options, judgments or any other restrictions or third party rights.

"*Knowledge of Seller*" (or words of like effect) shall mean the actual knowledge, after due inquiry (unless otherwise indicated herein), of Seller. "Knowledge" as it relates to a party other than Seller, shall mean the actual knowledge of such party, after due inquiry (unless otherwise indicated herein). In the absence of due inquiry, a person shall be deemed to have knowledge of information that would have been discovered by a reasonable inquiry.

"*Law*" means any applicable law, statute, ordinance, rule, regulation, directive, requirement, code, order, judgment, injunction, decree or judicial or administrative doctrine that is legally promulgated or issued by any Governmental Entity.

"*Liability*" shall mean any liability or obligation whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due.

"*Losses*" means damages, claims, losses, charges, actions, suits, Proceedings, deficiencies, interest, penalties and reasonable costs and expenses associated therewith (including reasonable attorneys' fees, Proceeding costs, fines, penalties and expenses of investigation), whether asserted by a party to this Agreement or by a third party.

"*Permitted Encumbrance*" means (a) any liens evidenced by an Assumed Contract, and (b) any liens which are not material, which do not interfere with the use of any of the Practice Assets and which do not secure the obligation to pay amounts; including, those liens or encumbrances arising out of any capital debt, capital lease or other long-term liabilities of Seller or the Practice ARE Permitted Encumbrances, except to the extent expressly excluded in this Agreement.

"*Person*" means an individual, a corporation, a partnership, a joint venture, a limited liability company, an association, a foundation, a trust or any other entity or organization.

LE003464

"***Proceeding***" means any claim, action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"***Required Consents***" means all consents and waivers, if any.

"***Taxes***" means any tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected, whether disputed or not, by or under the authority of any Governmental Entity or payable under any tax-sharing agreement or any other agreement or contract.

"***Trade Secrets***" shall have the meaning set forth in Tex. Civ. Prac. & Rem. Code § 134A.002(6).

### ARTICLE 2.      PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES

**2.1**    **Purchase of Assets**. Subject to the terms and conditions contained in this Agreement, at Closing Seller will sell, convey, assign, transfer and deliver to Purchaser all of its the Seller's property and assets, wherever located and utilized in the Practice, in each case as the same exists on the Closing Date, including, but not limited to the following (collectively, the "***Assets***"):

       **(a)**      all equipment and furnishings (including all medical equipment, computers, and other data processing equipment) used or usable by Seller in the operation of the Practice and which is either owned by Seller or leased by Seller under a capital lease, and any warranties related thereto;

       **(b)**      all commitments, contracts, agreements, operating leases, lease purchase arrangements and license agreements in respect of the Practice (collectively, the "***Assumed Contracts***");

       **(c)**      all inventories, supplies, other current assets and other assets located at or used in connection with the operation of the Practice;

       **(d)**      Purchaser shall sign a lease/sublease agreement for each of the Practice Locations.

**2.2**    **Excluded Assets**. Notwithstanding the provisions of Section 2.1, the Assets shall not include any of the following items, all of which are specifically excluded from the Assets (collectively, the "***Excluded Assets***"):

       **(a)**      all cash, cash equivalents, short term investments and marketable securities;

       **(b)**      all of the Seller's accounts receivable (whether receivable from patients or from third party payors) (the "***Practice Receivables***"); and

       **(c)**      The name "1960 Family Practice", and its assumed names,

LE003466

**EXHIBIT A/B #77**

(d)    its tax id number,

(e)    the following Excluded Assets will be leased to Purchaser at a fair market value monthly rate:

- Current telephone and fax numbers. Purchaser agrees to use the current numbers for the Practice for a period of 24 months following the Closing Date.

- Phone and Efax system

- EHR, RIS, PACS and practice management system

- IT support for these services and the maintenance of patient records through legacy EHR.

**2.3    Assumption of Certain Liabilities of Seller.**

(a)    Purchaser agrees to pay and satisfy all Liabilities of Practices incurred after the Closing Date. Purchaser is not responsible for Sellers Liabilities prior to the Closing Date.

(b)    Notwithstanding the foregoing, at Closing, Purchaser will assume and agree to satisfy the liabilities, including (collectively, the "***Assumed Liabilities***"):

(i)    the obligations arising under and related to the Assumed Contracts to the extent first arising after the Effective Time;

(ii)    buyer agrees to sign a lease or sublease for all Practice Locations. Purchaser agrees to comply with the terms of the Master/Prime Lease for each Location and shall execute a personal guaranty for payment of said leases, and

(iii)    any existing contractual or non-contractual liabilities used in the operation of the Practice

(iv)    Buyer will remain responsible for all obligations and liabilities incurred from the Closing Date to the termination date.

**2.4    Purchase Price.**

(a)    In consideration of the transfer of Assets to Purchaser, Purchaser agrees to pay to Seller Five Hundred Thousand and No/100 Dollars ($500,000.00) for the purchase of the Assets (the "***Purchase Price***"), subject to following adjustments and prorations:

(i)    Seller shall retain an option period extending 24 (twenty-four) months from the closing date ("Option Period"). During the Option Period the Seller has the right to offer for sale, commit to purchase, or otherwise engage any other party to purchase the Practice Locations and the associated Assets. Seller shall

4

offer Purchaser first right of refusal during the Option Period. Upon refusal by Purchaser to purchase and after the closing of another Purchaser, Seller shall return to Purchaser (1) the original Purchase Price, and (2) pay an additional 8%, Upon return of Purchase price this agreement shall be terminated.

(ii)     Seller will maintain an option, exercisable during the Option Period, to terminate the Sale with or without cause.  This option must be exercised in writing and within at least (30) thirty days'notice. If the sale is terminated, the sublease of the locations will also be terminated.  Buyer will remain responsible for all obligations incurred from the Closing Date to the termination date. Additionally, Buyer acknowledges that by the end of the last day of the notice period, it (a) no longer has any possessory right to control or use the Practice, assets or any part of the premises at the leased/subleased locations; and (b) will return to Seller all keys, security codes, passwords and badges related to the operation of the Seller. The Seller shall return to Purchaser the original Purchase Price.

(iii)     At any time during the Option Period and for an indefinite period beyond the Option Period, if Purchaser sells Practice business and/or the hospital business, currently located at 16750 Red Oak Dr., Houston, TX 77090, 837 Cypress Creek Parkway Suite 105, Houston Texas 77090;  20320 Northwest Freeway, Houston Texas 77065; 3550 Rayford, Spring, Texas 77386, 5039 FM 2920, Spring Texas 77388 or a relocated or additional address of businesses, the Purchaser is obligated to immediately turn over the first $90,000,000.00 (ninety million dollars) to Providence Hospital of North Houston, LLC.  Purchaser shall retain 50% of any remaining amount of the purchased amount over the $90,000,000.00 and immediately turn over the remaining 50% to Providence Hospital of North Houston, LLC. Purchaser acknowledges the Practice and hospital business refers to the current locations and to any relocation or additional location of said businesses. Purchaser acknowledges and agrees that the terms stated herein are binding and shall survive, regardless of what entity is then operating the businesses or where the businesses are located.

(b)     Purchaser shall pay the Purchase Price on the earlier of,  the date this Agreement is signed or on the date of Closing, by cashier's check or by wire transfer to an account designated in writing by Seller; provided, however, that if the Closing Date falls on a banking holiday, Purchaser shall pay the Purchase Price on the next business day which is not a banking holiday.

(c)     The Purchase Price shall be allocated among the acquired Assets. The parties shall use such allocation for purpose of complying with Section 1060(b) of the Code and for filing Form 8954 with the Internal Revenue Service, and the parties agree that they will not take or cause to be taken any action that would be inconsistent with such allocation.

**Assignment of Contracts**. Notwithstanding any provision of this Agreement to the contrary, to the extent that any contract to be assigned to Purchaser hereunder requires the waiver or consent of any other party, and such waiver or consent has not been obtained but whose benefits are being enjoyed by Purchaser, the contract shall be considered an Assumed Liability of Purchaser . In the

LE003468 **EXHIBIT A/B #77**

event that the Closing occurs without obtaining such waiver or consent, Seller and Purchaser agree to use their reasonable best efforts to obtain the necessary waiver or consent to the assignment of any such contract.

### ARTICLE 3.    CLOSING

**3.1    Closing**. Closing will take place at the offices of the Seller on September 1, 2019 or such other date as the parties may agree upon (the "***Closing Date***").. Closing will be deemed to have become effective at 12:01 a.m., local time, on the Closing Date (the "***Effective Time***").

**3.2    Actions by Seller at Closing**. At Closing and unless otherwise waived by Purchaser, Seller will deliver or shall cause to be delivered to Purchaser the following:

(a)    such other instruments and documents as are reasonably requested by Purchaser in connection with the consummation of the Transaction or to satisfy the conditions precedent to Purchaser's obligations hereunder.

**3.3    Actions by Purchaser at Closing**. At Closing and unless otherwise waived by Seller, Purchaser will deliver, or cause to be delivered, to Seller the following:

(a)    such other instruments and documents as are reasonably requested by Seller in connection with the consummation of the Transaction or to satisfy the conditions precedent to Seller's obligations hereunder.

### ARTICLE 4.    REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and (except as otherwise expressly stated herein) as of the Closing Date, Seller hereby makes the representations and warranties to Purchaser set forth below.

**4.1    Capacity and Authority**.  Seller is a professional association, duly organized and validly existing under the laws of the State of Texas. Seller has the requisite corporate power and authority to enter into this Agreement and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to conduct its business as now being conducted. Seller's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Seller of the transactions contemplated hereby and thereby, are within Seller's powers and have been duly authorized by all appropriate action. This Agreement and the other documents to be executed and delivered by Seller have been or will be duly executed and delivered by Seller, as the case may be.

**4.2    Consents; Absence of Conflicts with Other Agreements, Etc**. The execution, delivery and performance by Seller of the Agreement hereby: (a) will not conflict with any provision of Seller's organizational documents; (b) will not violate, conflict with or constitute on the part of Seller a breach of or a default under, or require approval or consent of any Person under, any Law, Governmental Authorization, material contract, agreement, indenture, mortgage or lease to which Seller, the Practice, or any of the Assets may be subject; and (c) will not create any Encumbrance on any of the Assets.

**4.3    Binding Effect**. This Agreement is and will constitute the valid and legally binding obligation of Seller, and is and will be enforceable

**4.4    Financial Statements and Contracts**. Seller will deliver to Purchaser a sample

LE003468

LE003469
**EXHIBIT A/B #77**

schedule of Practices' monthly expenses Exhibit B. Seller will make available to Purchaser true and complete copies of Assumed Contracts.

**4.5   Regulatory Compliance.** Seller is in compliance with all Laws of all Governmental Entities having jurisdiction over the Practice and its operations.

**4.6   Equipment and Other Assets.**

(a)   The Assets constitute all assets, properties and leasehold estates in the operation of the Practice, except for the Excluded Assets. All of the personal property owned or leased by Seller under an Assigned Contract is in good operating condition and repair, free from any defects (except such minor defects as do not interfere with the use thereof in the conduct of the normal operations), ordinary wear and tear excepted, have been maintained consistent with the standards generally followed in the industry.

(b)   All inventories are usable and saleable in a manner consistent with past practices and industry standards and are at levels sufficient to operate the Seller's Business in the ordinary course.

**4.7   Employee Relations.**

(a)   As used herein, the term "***Employee***" means, collectively, each Person, who on the Effective Date of this APA, is an employee of Seller and any other person listed on Exhibit A attached hereto who provides services for Seller.

(b)   On the Effective Date of this APA, or other date mutually agreed upon to allow for a smooth transition, Seller will terminate the employment of each of the Employees. Purchaser will offer employment to each Employee. As used herein, "***Hired Employee***" means each Employee who accepts Purchaser's offer of employment described above. Notwithstanding the foregoing, nothing in this Agreement will be deemed to require Purchaser to retain any Hired Employee for a certain period of time but Purchaser must be compliant with the WARN ACT and provide a 60 day notice to those employees being terminated.

(c)   The Hired Employees will be offered employment at a salary comparable to their current salary with Seller. The Hired Employees will be eligible to participate in Purchaser's employee benefit plans in accordance with the terms of such plans as amended from time to time. Hired Employees will be given credit for their existing earned but unused PTO and given credit for their full-time period of employment with Seller for purposes of determining the amount of paid time off under Purchaser's PTO plan and other benefits determined by tenure.

(d) During the Option Period, if the Purchaser intends to end the employment of a Hired Employee that would make $60,000.00 or more annually, Purchaser will notify Seller's administrator of the intent to terminate for administrators' mutual consent. The administrator for Seller shall be Stacy Williams. Seller shall notify Purchaser of any change of administrator.

LE003469

LE003470

**EXHIBIT A/B #77**

### ARTICLE 5.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and (except as otherwise expressly stated herein) as of the Closing Date, Purchaser represents and warrants to Seller as follows:

**5.1   Capacity and Authority**. Purchaser is a limited partnership, duly organized and validly existing in good standing under the laws of the State of Texas. Purchaser has the requisite corporate power and authority to enter into this Agreement and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to conduct its business as now being conducted. Purchaser's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Purchaser of the transactions contemplated hereby and thereby, are within Purchaser's powers and, subject to the receipt of approvals contemplated under Section 8.7, have been duly authorized by all appropriate action. Purchaser, its representatives, and agents shall owe a fiduciary duty to Seller and its members to operate the Practice and to use and manage Sellers Assets in good faith with the utmost business judgement. Purchaser shall not encumber, mortgage, cause a lien to attach to, commit waste, transfer, or convey any of the Sellers Assets during the Option Period.

**5.2   Consents; Absence of Conflicts with Other Agreements, Etc**. Purchaser's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Purchaser of the transactions contemplated hereby and thereby: (a) except as otherwise expressly provided herein, do not require any approval or consent of, or any declaration or filing with, any Governmental Entity which is required by Law; and (b) will not violate, contravene, conflict with or constitute on the part of Purchaser a breach of or a default under the respective articles of organization and operating agreement of Purchaser, any existing Law, or any material agreement, indenture, mortgage or lease to which Purchaser is subject.

**5.3   Binding Effect**. This Agreement and any other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against Purchaser in accordance with the respective terms hereof and thereof.

### ARTICLE 6.   PRE-CLOSING COVENANTS OF SELLER

**6.1   Operations**. Between the date of this Agreement and the Closing Date, Seller shall:

    (a)   carry on the business of the Practice in substantially the same manner as has heretofore been conducted and not make any material change in any operations, finance, accounting policies or real or personal property relating to the Practice, except as otherwise expressly required by this Agreement;

    (b)   at Seller's expense, maintain the Assets in as good working order and condition as at present, ordinary wear and tear excepted;

    (c)   maintain and preserve the business organization of the Practice intact, retain employees at the Practice (except for employment terminations in accordance with past practices

8

LE003471

**EXHIBIT A/B #77**

and in the ordinary course of business), maintain relationships with suppliers, patients and others having business relations with the Practice, and take such actions as are necessary to cause the smooth, efficient and successful transition of such business operations and employee and other relations to Purchaser as of Closing;

      **(d)**    notify Purchaser of any known event or circumstance or combination of events or circumstances that is reasonably likely to have a material adverse effect on the Seller or the Practice or would cause or constitute a breach of any of the Seller's representations, warrants, or covenants contained herein; and

      **(e)**    continue to cooperate with Purchaser's ongoing diligence investigation of the Practice and Assets.

      **6.2**    **Closing Conditions**. Between the date of this Agreement and the Closing Date, Seller will cause the conditions specified in Articles 8 and 9 over which Seller has control to be satisfied as soon as reasonably practicable, but in all events before Closing.

      **ARTICLE 7.**      **PRE-CLOSING COVENANTS OF PURCHASER**

      **7.1**    **Closing Conditions**. Between the date of this Agreement and the Closing Date, Purchaser will cause the conditions specified in Articles 8 and 9 over which Purchaser or any of its Affiliates has control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

      **ARTICLE 8.**      **CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER**

      The obligations of Purchaser hereunder are, subject to the satisfaction, on or prior to the Closing Date, of the following conditions, unless waived by Purchaser:

      **8.1**    **Representations, Warranties and Covenants**. The representations and warranties of Seller contained in this Agreement will be true in all material respects when made and on and as of the Closing Date (or the date otherwise specified herein) as though such representations and warranties had been made on and as of such date, except for those representations and warranties qualified by materiality, which shall be true in all respects.

      **8.2**    **Actions or Proceedings**. No Proceeding will have been instituted and remain in effect seeking to restrain or prohibit the transactions contemplated hereby; and no Governmental Entity will have taken any other action or made any request of Purchaser or Seller, or their respective agents, as a result of which Purchaser reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

      **8.3**    **Diligence; No Material Adverse Change**. Purchaser shall be satisfied with the results of its diligence investigation of Seller, the Practice and the Assets, and between the date hereof and the Closing Date, there shall not have been any event, circumstance, change or effect that, individually or in the aggregate, had or likely will have a material adverse change or affect on the Assets, business, prospects, financial condition or results of operations of Seller or the Practice.

LE003471

LE003472
**EXHIBIT A/B #77**

## ARTICLE 9.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller are, at the option of Seller, subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived by Seller:

**Representations, Warranties and Covenants**. The representations and warranties of Purchaser contained in this Agreement will be true in all material respects when made and on and as of the Closing Date (or the date otherwise specified herein) as though such representations and warranties had been made on and as of such date, except for those representations and warranties qualified by materiality, which shall be true in all respects; and each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof will have been duly complied with and performed in all respects.

**9.1    Actions or Proceedings**. No Proceeding before any Governmental Entity will have been instituted or threatened to restrain or prohibit the transactions contemplated hereby; and no Governmental Entity will have taken any other action or made any request of Seller or Purchaser as a result of which Seller reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

## ARTICLE 10.    OTHER COVENANTS AND AGREEMENTS

**10.1    Trade Secrets and Confidential Information**.

(a)    Purchaser agrees that it/he will not use, disclose, or reverse engineer the Trade Secrets or the Confidential Information for any purpose other than in connection with the medical practice formerly operated by Seller which shall be operated by Purchaser (such continued operations to be referred to as the "***New Practice***"), except as authorized in writing by Seller or its Affiliate. The obligations under this Section 10.1 shall remain in effect as long as the information constitutes Confidential Information or a Trade Secret. The confidentiality, property, and proprietary rights protections available in this Agreement are in addition to, and not exclusive of, any and all other rights to which Purchaser is entitled under any other contracts or federal and state law, including, but not limited to, rights provided under copyright laws, trade secret and confidential information laws, and laws concerning fiduciary duties.

(b)    In the event Purchaser breaches any portion of Section 10.1 Above during the Option Period, nothing contained in this Agreement shall limit Sellers's right to any remedies at law or in equity. If Purchaser breaches any portion of Section 10.1 above, Purchaser agrees that: (i) Seller would suffer irreparable harm; (ii) money damages alone would be an inadequate remedy for the injuries suffered by Seller; and (iii) if Seller seeks injunctive relief to enforce Section 10.1 above, Purchaser shall waive and shall not: (A) assert any defense that Seller has an adequate remedy at law with respect to the breach, (B) require that Seller submit proof of the economic value of any Trade Secret or Confidential Information, or (C) require Seller to post a bond or any other security.

LE003472

LE003473
**EXHIBIT A/B #77**

(c)     The covenants set forth in Section 10.1 of this Agreement shall be construed as an agreement independent of (i) any other agreements, or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Purchaser against Seller, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Seller or Purchaser may have against the other, shall not constitute a defense to the enforcement by Seller of any of the covenants set forth in Section 10.1 of this Agreement. Seller shall not be barred from enforcing any of the covenants set forth in Section 10.1 of this Agreement by reason of any breach of (i) any other part of this Agreement, or (ii) any other agreement with Purchaser.

(d)     If any covenant in Section 10.1 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against Purchaser.

10.2   **Confidentiality**. This "***Confidentiality Agreement***", shall remain in full force and effect. In addition to the covenants in the Confidentiality Agreement, except as expressly contemplated hereunder, neither party will disclose to any Person any of the terms, conditions or other facts with respect to the Transaction, including the status thereof; provided, however, that each party may disclose such information (i) to its officers and advisors who need to know the same for the sole purpose of evaluating the Transaction and also have been informed of the confidential nature of the Confidential Information and have been directed to hold such information in strict confidence and to use such information solely for the purposes permitted hereunder, (ii) to third parties in connection with obtaining Required Consents, and (iii) to the extent required under applicable Law. Notwithstanding any provision to the contrary in the Confidentiality Agreement, Seller authorizes Purchaser and its representatives to disclose information regarding the Transaction with Seller's employees in a manner mutually acceptable to Seller and Purchaser that will not be disruptive to current operations.

10.3   **Access**. Purchaser may continue its due diligence review and investigation of Seller including its business, assets and liabilities. Seller shall provide Purchaser and its representatives with copies of, and/or reasonable access to, all information requested by Purchaser relating to the operations, assets and financial condition of Seller, together with reasonable access to the management and employees of Seller, for the purpose of conducting such due diligence. Purchaser and its representatives will use good faith efforts to conduct due diligence in such manner as to minimize any disruption to Seller's business. The parties shall cooperate with one another in the due diligence process.

10.4   **Books and Records**.

(a)     After the Closing Date,  Purchaser will maintain in the ordinary course of business all books and records of the Practice which relate to the post-Closing business, operations and affairs of the Practice, and Seller will maintain in the ordinary course of business all such books and records which relate to the pre-Closing business.

10.5   **Further Assurances**. After Closing, and without further consideration,  each party shall, at the request of the other party, execute and deliver such further documents and instruments of conveyance, assignment, and transfer and shall take such further reasonable actions as may be

LE003473

necessary or desirable, in the reasonable opinion of the requesting party, to consummate the transactions contemplated hereunder or to carry out the intent of this Agreement.

10.6    **Risk of Loss**. Seller will bear all risk of loss, destruction or damage to any of the Assets occurring prior to Closing, whether due to fire, accident or other casualty, willful act, condemnation, riot, act of God or otherwise, and Purchaser will have no responsibility with respect thereto.  Purchaser will bear all risk of loss, destruction or damage to any of the Assets occurring post Closing, whether due to fire, accident or other casualty, willful act, condemnation, riot, act of God or otherwise, and Seller will have no responsibility with respect thereto.

10.7    **Publicity**. From and after the date hereof, neither party shall publish any press release or make any other public communications with respect to the transactions contemplated hereby and the method of release thereof unless mutually agreed upon by Seller and Purchaser.

### ARTICLE 11.         INDEMNIFICATION

11.1    **Indemnification by Seller**. Seller hereby indemnifies and holds harmless Purchaser against any Losses suffered by Purchaser arising out of or resulting from:

(a)      the breach or failure of any representation or warranty of Seller contained in this Agreement or any of the Transaction Documents;

(b)      the breach or nonfulfillment of any agreement or covenant of Seller contained in this Agreement or any of the Transaction Documents; or

(c)      any liability, Encumbrance (other than Permitted Encumbrances), obligation, claim against or contract of Seller, its Affiliates, Shareholders or the Practice, of any kind or nature whatsoever, and at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or otherwise disclosed to Purchaser, due to or arising by reason of any transaction or event occurring prior to Closing, which is not an Assumed Liability; or

(d)      any Retained Liability; or

(e)      any Excluded Asset; or

(f)      any act of commission or omission of Seller, its Affiliates, any Shareholder or the Practice, or their respective employees, officers, agents or independent contractors, prior to Closing; or

(g)      the use, operation or maintenance of the Assets or the Practice prior to Closing; or

(h)      any claim for brokerage commission or finder's fee asserted by any person, firm or corporation claiming to have been engaged by Seller.

11.2    **Indemnification by Purchaser**.  Purchaser will indemnify and hold harmless Seller against any Losses suffered by Seller arising out of or resulting from:

(a)      the breach or failure of any representation or warranty of Purchaser

12

LE003475 **EXHIBIT A/B #77**

contained in this Agreement or in any of the Transaction Documents; or

    **(b)**    the breach or nonfulfillment of any agreement or covenant of Purchaser contained in this Agreement or in any of the Transaction Documents; or

    **(c)**    any Assumed Liability; or

    **(d)**    any act of commission or omission of Purchaser, or its employees, officers, agents or independent contractors, subsequent to Closing; or

    **(e)**    the use, operation or maintenance of the Assets or the Practice by Purchaser after the Closing; or

    **(f)**    any claim for brokerage commission or finder's fee asserted by any person, firm or corporation claiming to have been engaged by Purchaser.

    **11.3**    **Survival.**

    **(a)**    Each of the covenants set forth in this Agreement will survive the Closing in accordance with its terms.

    **(b)**    Notwithstanding anything herein to the contrary, the rights and remedies under this Article 11 with respect to any Proceeding (including, without limitation, recovery of Losses in respect thereof) for which notice has been given prior to the applicable Representation Survival Date will survive until such Proceeding has been resolved.

    **11.4**    **Limitations.**

    **(a)**    As used in this Article 11, the term "*Losses*" include only losses actually paid or incurred and does not include any amounts recovered from any surety, insurance carrier, or third party obligor.

    **(b)**    Notwithstanding anything contained herein to the contrary, (i) Seller not be required to make any indemnification payment pursuant to Section 11.1(a) of this Agreement with respect to Losses.

    **(c)**    During the Option Period, Purchaser, its representatives, and agents shall owe a fiduciary duty to Seller and its members to operate the Practices and to use and manage the Sellers Assets in good faith and with the utmost business judgment. Purchaser shall not encumber, mortgage, cause a lien to attach to, commit waste, transfer, or convey any of the Sellers Assets during the Option Period

## ARTICLE 12.    TERMINATION

    **12.1**    **Termination**. This Agreement may be terminated at any time during the Option Period as follows:

    **(a)**    by the mutual consent of Purchaser and Seller;

    **(b)**    by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been cured (to the extent curable) to the reasonable satisfaction

13

LE003475

LE003476

**EXHIBIT A/B #77**

breach then Seller can give a 15 (fifteen) day termination notice to Purchaser;

      **(c)**     Seller can terminate this agreement without cause with a 30 (thirty) day written notice to Purchaser

      **(d)**     by Seller, upon notice to Purchaser, if between the date hereof and the Closing Date there has occurred (or been discovered) any event, condition or change in the operations of the Purchaser, or in the financial condition, assets, liabilities (contingent or otherwise) or income of Purchaser, which, individually or in the aggregate, results in or is reasonably likely to result in a material adverse effect on the assets, operations, results of operations, or financial condition of Purchaser taken as a whole; or

      **12.2**    **Effect of Termination**. In the event of any termination of this Agreement, as provided by Section 12.1 or Section 2.4 , this Agreement will thereupon become void and of no effect, no party will have any further rights or obligations hereunder, and no party will have any liability to any other party arising out of such termination except those obligations and rights as stated herein. Upon termination, Seller shall return the Purchase Price to Purchaser. Purchaser acknowledge that termination of this Agreement for a breach in no way limits the causes of actions or remedies available to Seller under the applicable law.

      **ARTICLE 13.**     **IN GENERAL**

      **13.1**    **Costs**. Whether or not the transactions contemplated hereby are consummated and except as otherwise expressly provided herein, each party will be responsible to pay its own costs and expenses incurred in connection with proceeding with the Transaction, including, but not limited to, any legal fees incurred by such party. Purchaser or its Affiliate will pay the costs and expenses of consultants and advisers jointly engaged by Purchaser or its Affiliate, on the one hand, and Seller, on the other hand. Seller shall timely pay all sales, transfer or similar taxes required to be paid by reason of the sale by Seller to Purchaser of the Assets pursuant to this Agreement.

      **13.2**    **Notices**. Any notice, demand or communication required, permitted or desired to be given hereunder will be in writing and will be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including telecopy and telex) or overnight courier, or five (5) days after being deposited in the United States mail, with postage prepaid thereon, by certified or registered mail, return receipt requested, addressed as follows:

if to Seller:
          1960 Family Practice

                  Attn: Huong T Le, President

                  20320 Northwest Freeway Ste 900

                  Houston, Texas 77065

with copies to:
          huonglemd@yahoo.com

                  hlemd1@yahoo.com

LE003476

LE003477

**EXHIBIT A/B #77**

imaging50@live.com

stacy.williams@tmmsonline.net

hkhemka1@tmmsonline.net

if to Purchaser:

with copies to:

or to such other address, and to the attention of such other Person or officer as any party may designate by notice given in like manner.

13.3     **Schedules and Other Instruments**. Each Schedule, each certificate provided hereunder and each written disclosure required hereby is incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full; provided, however, that information set forth on any Schedule, certification or written disclosure constitutes a representation and warranty of the party providing the same, and not the mutual agreement of the parties as to the facts therein stated. Any Schedule may be amended after the date hereof only on the mutual written consent of the parties.

13.4     **Choice of Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Texas without regard to its principles of conflicts of laws.

13.5     **Benefit; Assignment**. Subject to express provisions herein to the contrary, this Agreement will inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns, and the rights and obligations of the parties hereunder will survive the sale or other transfer of substantially all of the assets of any party or a change in control of any party. Purchaser may not assign any of its rights or obligations under this Agreement without the express written consent of Seller. Seller may assign all or part of its rights and obligations hereunder to an Affiliate of Seller, including but not limited to Minh C Nguyen, MD or Huong T Le, MD.

13.6     **No Rights in Third Parties**. Nothing contained in this Agreement will be construed as giving rise to any right to enforce its provisions to any Person not a party to this Agreement under any legal theory.

13.7     **Waivers and Consents**. Any waiver of any provision of this Agreement and any consent given hereunder must be in writing signed by the party sought to be bound. The waiver by any party of breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver of any subsequent breach or violation of the same or any other provision hereof.

13.8     **Interpretation**. In the event any provision of this Agreement is held to  be invalid,

15

LE003477

LE003478

**EXHIBIT A/B #77**

illegal, or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability will in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which will be and remain in full force and effect, enforceable in accordance with its terms. Inasmuch as this Agreement is the result of negotiations among sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, any party will be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party. The Article and Section headings of this Agreement are for convenience of reference only and do not form a part hereof and do not in any way modify, interpret or construe the intention of the parties.

13.9    **Entire Agreement; Amendment**. This Agreement together with any other agreements expressly contemplated hereby supersede all previous agreements (except for the Confidentiality Agreement, which shall continue to be in effect) and constitute the entire agreement of whatsoever kind or nature existing among the parties representing the within subject matter, between Seller and Purchaser, and no party will be entitled to benefits other than those specified herein and therein. The parties specifically acknowledge that in entering into and executing this Agreement and any other agreements specifically referenced herein or therein, the parties rely solely upon the representations and agreements contained herein and therein and no others. All prior representations or agreements, whether written or oral, not expressly referenced herein are superseded unless and until made in writing and signed by the party sought to be charged therewith. This Agreement may be amended, and the terms hereof may be modified, only by a writing executed by each party hereto, and any matter referred to herein as mutually agreed to or designated by the parties must be evidenced by such a writing.

13.10    **Counterparts**. This Agreement, and any document or instrument required or permitted hereunder, may be executed in counterparts, each of which will be deemed an original and all of which together will constitute but one and the same instrument.

LE003478

LE003479                    **EXHIBIT A/B #77**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized officers, all as of the date and year first above written.

**SELLER:**                              **PURCHASER:**

**1960 Family Practice, PA**             **Doctors Hosital 1997 LP d/b/a United Memorial Medical Center**

_____              _____
Huong T Le, M.D.                         ~~Syed Rizwan Mohiuddin~~   RAVI MALLAPURAM
President                                Its   MANAGING  DIRECTOR

_____              _____
Date   8/16/2019                         Date   08/16/2019

17

LE003479

**EXHIBIT A/B #77**

## Exhibit A

Employees

[See attached]

LE003480

LE003481

**EXHIBIT A/B #77**

### Exhibit B

Sample Schedule of Monthly Expenses

[See attached]

LE003481

Debtor  **Providence Hospital of North Houston LLC**                    Case number *(If known)* **20-34238**
Name

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $18,120.18 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $1,053,538.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.*........................................................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $1,071,658.18 | + 91b.  $0.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $1,071,658.18 |